## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ABINGTON HEIGHTS            :
SCHOOL DISTRICT            :
                          :
            Plaintiff,    :
                          :    3:14-CV-00368
v.                        :    (JUDGE MARIANI)
                          :
A.C., et al.,             :
                          :
            Defendants.   :

FILED
SCRANTON

MAY 0 2 2014

PER _____
DEPUTY CLERK

### MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is a Motion for a Statutory Stay Put Injunction (Doc. 3) pursuant to 20 U.S.C. § 1415 and FED. R. CIV. P. 65, filed by the Abington Heights School District ("Abington Heights") on February 27, 2014, to stay implementation of a Special Education Hearing Officer's "stay-put" order. The school district contends that the Hearing Officer erred in his application of the Individuals with Disabilities Education Act, 20 U.S.C. §§1400-91 ("IDEA"), and specifically § 1415(j).

Subsequent to receiving Plaintiff's motion, and upon agreement by counsel for both parties, the Court held an evidentiary hearing on the narrow issue of whether A.C.'s difficulties with transitions, and the resulting educational and medical impact as well as the

loss of access to his sibling[1], would negatively affect A.C.'s educational functioning and ability to access his school program if he were transferred to, and educated at, Clarks Summit Elementary instead of Waverly Elementary.  At the end of this hearing, the Court ordered the parties to submit supplemental briefs, specifically on the issue of whether Abington Heights must meet the traditional prerequisites for the issuance of injunctive relief under FED. R. CIV. P. 65 as has been held by the Ninth Circuit in *Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of CA*, 287 F.3d 1176 (9th Cir. 2002).

The parties have now fully briefed the motion, and it is ripe for decision.  For the reasons set forth below, the Court will deny Plaintiff's motion.

## II. FACTUAL BACKGROUND

A.C. is a nine year old boy who is currently in second grade.  (Relevant Facts Stipulated by the Parties for Purposes of a Pendency Determination, Doc. 1, Ex. F, ¶ 1).  He resides with his family in the Abington Heights School District and has attended Waverly Elementary School, one of four elementary schools within the District, since kindergarten. (*Id.* at ¶¶ 1, 3).  A.C. has been diagnosed with Down Syndrome and receives special education services under the eligibility category of "Intellectually Disabled."  (*Id.* at ¶ 2).

On January 2, 2014, counsel for A.C.'s parents informed the District that A.C. had been hospitalized from December 22 through December 24, 2013 and diagnosed with Type I Diabetes. (*Id.* at ¶ 7).

---

[1] A.C.'s brother no longer attends Waverly Elementary; therefore there is no issue as to the effect on A.C. by "the loss of access to his sibling" as suggested by the defendants.

Prior to A.C.'s hospitalization, his Individualized Education Program ("IEP") team was scheduled to meet in December, 2013, to develop his new IEP. (*Id.* at ¶ 4). At this time, Dr. Kara Schmidt had also completed an Independent Educational Evaluation ("IEE") to be considered by the IEP team. (*Id.*). On December 19, 2013, a draft IEP was issued to A.C.'s parents and a full IEP meeting was scheduled for January 9, 2014, to review the draft IEP, speak with Dr. Schmidt about her IEE, and review the results of new occupational therapy and speech evaluations. (*Id.* at ¶ 6). After learning of A.C.'s hospitalization and diabetes diagnosis, counsel for the parents and school district agreed that A.C. would need additional accommodations and that A.C.'s IEP team would consider the changes at the January 9, 2014, IEP team meeting. (Doc. 1, Ex. F, ¶ 7).

On January 9, 2014, A.C.'s IEP team, as well as counsel for both parties, met regarding A.C.'s draft IEP. (*Id.* at ¶ 8). The team, in conjunction with the school nurse, also reviewed and developed several plans, including a care plan to help manage A.C.'s diabetes during the school day, an emergency plan for Hypoglycemia, an individual health plan, and a safety plan for A.C.'s bus driver and the transportation manager. (*Id.* at ¶¶ 9, 10).

The draft IEP sent to A.C.'s parents in December, 2013, proposed supplemental learning support at Waverly Elementary, the same level and type of support that A.C. was receiving in his previous IEP from 12/20/2012. (*Id.* at ¶ 5). However, monitoring A.C.'s blood sugar pursuant to the care plan developed at the January 9, 2014, meeting, as well as

3

ensuring the emergency care discussed, requires a full-time nurse and Waverly Elementary is only staffed by a part-time nurse during the school day. (*Id.* at ¶¶ 11, 12). At the January 9th meeting, the District proposed changing A.C.'s school to Clarks Summit Elementary, another school within the Abington Heights School District, which is staffed by a full-time nurse throughout the school day. (*Id.* at ¶ 13).

While both the parents and school district agree that the IEP dated 12/20/2012 is A.C.'s pendent IEP until a new IEP is in place; that A.C. now requires the services of a full-time nurse during school hours; and that Waverly Elementary's part-time nursing services are inadequate; the parties disagree as to whether the pendent IEP must be implemented in a learning support classroom and general education environment at Waverly Elementary or a learning support and general educational environment at Clarks Summit Elementary. (*Id.* at ¶¶ 14-17). Therefore, in response to the District's proposal to implement the pendent IEP at Clarks Summit Elementary in a learning support environment, A.C.'s parents contended that Clarks Summit Elementary was not the pendent placement and sought an order compelling Abington Heights to implement the 12/20/2012 IEP at Waverly Elementary. (*Id.* at ¶¶ 20, 21). On February 20, 2014, Hearing Officer Brian Ford issued a Pendency Order naming Waverly Elementary School as A.C.'s pendent placement, in accordance with 20 U.S.C. § 1415(j). (Pendency Order, Doc. 1, Ex. I). In response to the hearing officer's decision, Abington Heights filed an interlocutory appeal of the Pendency Order with this Court. The school district argues that under the IDEA, the Hearing Officer erred when he

4

(1) "determined that a building is an educational placement"; (2) "determined that the District must provide additional staff at Waverly to implement pendency"; and (3) "credited the arguments of counsel as evidence instead of applying the proper legal standard." (Pl.'s Brief in Support of its Motion for a Statutory Stay-Put Injunction, Doc. 4, at 5).

### III. STANDARD OF REVIEW

In reviewing an administrative officer's decision, the district court must apply a "modified *de novo*" standard wherein the court is required to make its own findings by a preponderance of the evidence while also giving due weight to the factual findings of the ALJ. *L.E. v. Ramsey Bd. Of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006); *see also School Regional High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). Additionally, the district court is "required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." *S.H. v. State-Operated School Dist.*, 336 F.3d 260, 270 (3d Cir. 2003). However, "where the District Court hears additional evidence it is 'free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act.'" *Id.* (quoting *Oberti v. Bd. of Educ. of the Borough of the Clementon School Dist.*, 995 F.2d 1204, 1220 (3d Cir. 1993)). Nonetheless, a district court owes no deference to a Hearing Officer's conclusions of law. *S.H. v. State-Operated School Dist.*, 336 F.3d at 270.

## IV. ANALYSIS

### A. The Individuals with Disabilities Education Act

The IDEA's purpose is to provide disabled children with a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living," as well as to "ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A-B). As such, the IDEA contains a "stay-put" provision which requires an educational agency to maintain the disabled child's educational placement during the pendency of due process hearings. In relevant part, the provision states that:

> during the pendency of any proceedings . . . unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j). This "unequivocal" language was "meant to strip schools of the *unilateral* authority [schools] had traditionally employed to exclude disabled students . . . from school." *Honig v. Doe*, 484 U.S. 305, 323, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (emphasis in original). The Third Circuit has recognized that this provision "represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with

regard to their placement is ultimately resolved." *Drinker by Drinker v. Colonial School Dist.*, 78 F.3d 859, 864 (3d Cir. 1996).

In light of Congress' language, the relevant inquiry under §1415(j) is the identification of the "then-current educational placement of the child." *Drinker*, 78 F.3d at 865.  Neither the text of the IDEA nor the Act's legislative history defines the term 'educational placement.'  However, according to the Third Circuit, "the dispositive factor in deciding a child's 'current educational placement' should be the Individualized Education Program ("IEP") . . . actually functioning when the 'stay put' is invoked." *Drinker*, 78 F.3d at 867 (quoting *Woods v. New Jersey Dep't of Educ.*, No. 93-5123, 20 Indiv. Disabilities Educ.L.Rep. (LPR Publications) 439, 440 (3d Cir. Sept. 17, 1993)).  Therefore, "the question of what constitutes a change in educational placement is, necessarily, fact specific", and the determination turns on "whether the decision is likely to affect in some significant way the child's learning experience." *DeLeon v. Susquehanna Community School Dist.*, 747 F.2d 149, 153 (3d Cir. 1984).

### B. Plaintiff's Motion for a Statutory Stay-Put Injunction – Applying a Traditional Preliminary Injunction Analysis

"The stay-put provision was intended to serve as a type of 'automatic preliminary injunction' preventing local educational authorities from unilaterally changing a student's existing educational program." *Michael C. ex rel. Stephen C. v. Radnor Twp. School Dist.*, 202 F.3d 642, 650 (3d Cir. 2000); *see also Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982) ("The statute substitutes an absolute rule in favor of the status quo for

the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships."). Therefore, the traditional preliminary injunction elements are not applicable when obtaining a stay-put injunction. Instead, the parent must show a fundamental change in, or elimination of, a basic element of the education program. *R.B. ex rel Parent v. Mastery Charter School*, 762 F.Supp.2d 745, 757 (E.D.Pa. 2010), *aff'd*, 532 Fed.Appx. 136 (3d Cir. 2013). However, this Court is now faced with an issue not previously directly addressed by the Third Circuit: whether a party seeking to enjoin a preexisting stay-put order must meet the traditional elements required for a preliminary injunction.

In *Johnson*, an autistic child sought injunctive relief to challenge and dissolve an existing stay-put order and to compel the Hearing Office to issue a substitute order modifying the child's 'then current educational placement'. *Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of CA*, 287 F.3d 1176 (9th Cir. 2002). The Ninth Circuit held that

> a request to enjoin a preexisting "stay-put" order is handled appropriately by the district court's application of traditional preliminary injunction analysis. To enjoin a "stay-put" order, a litigant must demonstrate either "(1) a combination of probable success and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardship tips in his favor."

*Johnson*, 287 F.3d at 1180 (quoting *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000)). The Court reasoned:

> [the student's] injunction request in district court asking for another order to his liking was not entitled to automatic replication of the status quo because

8

> the "stay put" order accomplishing that purpose had already been granted by
> the Hearing Office. Instead, as with most injunctions, the district court [is]
> required to examine the validity of the existing "stay put" order and balance
> the equities.

*Johnson*, 287 F.3d at 1180. The Third Circuit has cited approvingly to *Johnson*, although

never specifically addressing the soundness of *Johnson*'s holding in relation to this issue.

*See Pardini v. Allegheny Intermediate Unit*, 420 F.3d 181 (3d Cir. 2005) [2] (stating that the

Court "[does] not disagree with the reasoning in *Johnson*" in relation to the Ninth Circuit's

analysis that the educational agency was not required to provide the child with the exact

same educational program, but finding that the district court in *Pardini* applied *Johnson*'s

preliminary injunction analysis in error given that, unlike in *Johnson*, there was no

preexisting stay-put order in *Pardini*) [3]; *see also M.K. v. Roselle Park Bd. of Educ.*, 2006 WL

3193915 (D.N.J. Oct. 31, 2006) (J. Greenaway) (applying the traditional preliminary

injunction analysis in deciding Plaintiff's motion to enjoin an ALJ's stay-put order).

The Third Circuit's language in *Pardini* and *Drinker* further support our determination

that a preliminary injunction analysis is appropriate in this case. Both cases reiterate the

"unequivocal" nature of the stay-put order and state that § 1415(j) "represents Congress'

---

[2] In *Pardini*, a three-year-old child was required under the IDEA to transition out of her Individualized Family Service Plan ("IFSP") to an IEP. The child's parents appealed a district court ruling that, during the pendency of the due process hearing, the child's new IEP was not required to include the conductive education that the child had been receiving under the IFSP. The Third Circuit reversed, holding that the stay-put provision required the child "to continue to receive conductive education until the dispute over its appropriateness for inclusion in her IEP was resolved." *Pardini*, 420 F.3d at 192.

[3] Plaintiff's argument that "the *Pardini* court rejected the *Johnson* analysis" is meritless and misstates the Third Circuit's analysis. (Pl. Mem. in Supp. of its Mot. for a Statutory Stay-Put Injunction, Doc. 27, at 3). Unlike in *Johnson*, in *Pardini*, an existing stay-put order was not in place. The Third Circuit never reached the issue of whether a preliminary injunction analysis would have been appropriate if a stay-put order had already been issued.

policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." *Pardini*, 420 F.3d at 190 (quoting *Drinker*, 78 F.3d at 864). Furthermore, the Court emphasized "the importance of maintaining the status quo when identifying 'the then current educational placement' for purposes of the stay-put rule." *Id.* Consequently, the expressed policy of § 1415(j) weighs so heavily in favor of leaving a Hearing Officer's decision undisturbed and maintaining the status quo, even in the absence of a meritorious argument on the part of the child's parents, that the party moving to enjoin a stay-put order must satisfy the elements for preliminary injunctive relief.

Plaintiff argues that the traditional preliminary injunction requirements do not apply in this case. However, with one possible exception,[4] this Court is unaware of any authority

---

[4] The only other approach is that of the Seventh Circuit. *See Casey K. ex rel. Norman K. v. St. Anne Community High School Dist. No. 302*, 400 F.3d. 508 (7th Cir. 2005) (J. Posner). In *Casey K.*, an elementary school district reached a settlement agreement with the parents of a dyslexic child to allow him to enroll in a private school at the expense of the public school. When Casey became the responsibility of the high school district, the new IEP did not provide for him to remain at the private school at the high school district's expense. Casey's parents instituted a due process hearing and the Hearing Officer issued a stay-put injunction. The Circuit refused to dissolve or vacate the injunction, ruling that the high school district, despite not being a party to the original settlement agreement, had the same stay-put obligations as if the two schools were in the same district. The Third Circuit has never cited to this decision, and only one court within our Circuit has cited to this case, but for a different proposition. *See J.B. v. Watchung Hills Regional School Dist. Bd. of Educ.*, 2006 WL 38936 (D.N.J. Jan. 5, 2006) (granting summary judgment in favor of Plaintiffs and holding that Plaintiffs were not barred under the IDEA from seeking reimbursement from the school district for its' unilateral placement of the student).

A substantial part of Abington Heights' argument relies on a contention that it is not seeking to enjoin the stay-put order, but instead to vacate it. (Doc. 27, at 7-9.) In *Johnson*, despite stating that Plaintiff "sought to challenge and to dissolve an existing 'stay put' order", the Ninth Circuit only specifically performed its analysis as a request to enjoin the Hearing Office's decision, not to vacate it. *Johnson*, 287 F.3d at 1180. While we believe that the same standard applies, in the alternative, *Casey K.* specifically provides that a stay-put order can be either dissolved or modified by showing a compelling reason for such a request as well as an unreasonable burden on the school in question. *See Casey K.*, 400 F.3d. at 513

pursuant to which FED. R. CIV. P 65 has been applied to issue a preliminary injunction without satisfaction of the four criteria which are a prerequisite to such relief, and the school district has provided no authority contrary to this well-established rule. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 32, 129 S.Ct. 365, 67 ERC 1225 (2008) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course. . . . The factors examined above—the balance of equities and consideration of the public interest—are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." (Citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 17 ERC 1217 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."))).

Here, the hearing officer has already issued a stay-put order, effectively an automatic preliminary injunction. Therefore, applying the reasoning of *Johnson* and the Third Circuit's observations concerning the policy of § 1415(j), to succeed on a motion to enjoin an existing stay-put order, Abington Heights must meet the traditional elements for a preliminary injunction. Specifically, the school district must establish that (1) it is likely to succeed on the merits; (2) denial will result in irreparable harm to the district; (3) granting

---

("[T]he [stay-put] automatic injunction can be dissolved for a *compelling reason*" and if "the refusal to lift the automatic injunction would impose an *unreasonable burden* on the transferee school, the district court could exercise its equitable discretion to modify or dissolve the injunction." (Emphasis added)).

Here, none of the reasons offered by Abington Heights are sufficiently forceful and convincing to be found "compelling." Furthermore, as will be discussed when balancing the hardships between Abington Heights and A.C. under a preliminary injunction analysis, *infra*, the burden placed on the school district by the stay-put order is not "unreasonable" in light of the circumstances in the present case and the potential harm to A.C. Therefore, Plaintiff would fail to meet its burden under *Casey K*.

preliminary relief will not result in even greater harm to the non-moving party, here, A.C.;

and (4) granting the injunction is in the public interest. *See Conestoga Wood Specialties*

*Corp. v. Sec'y. of the U.S. Dept. of Health and Human Services*, 724 F.3d 377, 382 (3d Cir.

2013) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). The

preliminary injunction is inappropriate if the plaintiff fails to establish each element in its

favor. *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).

### 1. Abington Height's Likelihood of Success on the Merits

To succeed on the merits, Abington Heights must establish that the Hearing Officer

erred in his determination that Waverly Elementary was a component of A.C.'s 'current

educational placement' and that the school district is likely to ultimately prevail in the

Hearing Officer's final decision.

As established by *Drinker*, the dispositive factor in deciding a child's 'current

educational placement' is the functioning IEP at the time the stay-put provision is invoked.

While location cannot be "entirely divorced" from an inquiry into the child's proper

educational placement, it is not the conclusive factor. *George A. v. Wallingford Swathmore*

*School Dist.*, 655 F.Supp.2d 546, 550 (E.D. Pa. 2009); *see also Bd. of Educ. of Community*

*High School Dist. No. 218 v. Illinois State Bd. of Educ.*, 103 F.3d 545, 548 (7th Cir. 1996)

(examining case law developed by other circuit courts and finding a consensus that "the

meaning of 'educational placement' falls somewhere between the physical school attended

by a child and the abstract goals of a child's IEP"). Other factors that courts within the Third

Circuit have considered relevant in determining a student's educational placement include the location of services, a student's "extensive history" at a particular school, and the distance between classrooms. *R.B. ex rel Parent v. Mastery Charter School*, 762 F.Supp.2d at 753; *George A.*, 655 F.Supp.2d at 551; *Roselle Park Bd. of Educ.*, 2006 WL 3193915 at *13.

Abington Heights argues that the Hearing Officer's stay-put order was issued in error because no fundamental change in, or elimination of, a basic element of A.C.'s educational program would result if A.C. were moved to Clarks Summit Elementary. (Doc. 4, at 11). Plaintiff maintains that in order for a pendency order to be issued by the Hearing Officer, A.C.'s parents must have established the presence of such a fundamental change or elimination, and failed to do so. (*Id.*). Plaintiff also contends that A.C.'s transitional difficulties, if any, are insufficient to create a change in educational placement. (*Id.*).

We do not disagree with the school district's analysis, only its conclusions. However, we do not believe that the Hearing Officer "confused the term 'educational placement' with a particular school building," "misapplied well established law," or erred as a matter of law in allegedly "relying exclusively upon off-the record allegations by Parents' counsel" as Plaintiff contends. (Doc. 4, at 13, 19). In his Pendency Memorandum, the Hearing Officer properly recognized that the stay-put provision effectively creates an automatic preliminary injunction, that such injunction is only available when there is a proposed change to the student's educational placement, and that § 1415(j) cannot be so narrowly construed as to

"mandate the student remain in the exact same physical location where he or she was schooled at the time the dispute arose." (Pendency Memorandum, at 3). In light of this, he noted that, at first look, Abington Heights' proposed move may be permissible. (*Id.* at 4). However, the Hearing Officer determined that A.C.'s parents' averments regarding A.C.'s transitional difficulties created a "wrinkle" and that consequently, "moving the student to a new building is inconsistent with the stay-put rule." (*Id.*).

Given the contents of the Pendency Memorandum, Plaintiff's arguments regarding the Hearing Officer's misunderstanding of the term 'educational placement' and misapplication of § 1415(j) are unpersuasive. Plaintiff's contention that the Hearing Officer erred as a matter of law in allegedly "relying exclusively upon off-the record allegations by Parents' counsel" carries some weight but ultimately fails. Plaintiff admits that the Hearing Officer reviewed "the Parents' motion, the District's response brief, and the stipulated facts" but that prior to the start of the scheduled hearing session on February 20, 2014, "held an off-the-record conference with counsel where he heard brief arguments from counsel" and subsequently ruled that pendency attached to Waverly Elementary. (Complaint, Doc. 1, ¶¶ 27, 34). Therefore, not only did the Hearing Officer presumably consider more than just A.C.'s parents' arguments regarding transitional issues, his Pendency Memorandum specifically contradicts the underlying basis for Plaintiff's argument. In this memorandum, the Hearing Officer states that there is no stipulation regarding possible transition issues, but that the parents' averments were made both in their pendency motion and repeated

during the meeting on February 20, 2014, creating the reasonable inference that he was aware of this issue prior to the "off-the record allegations" and was not relying exclusively on that conversation in making his determination. (Pendency Memorandum, at 4). While the Hearing Officer's determination that the parents met their burden of proof is thinly supported, it is conditional pending the presentation of further evidence during the ongoing due process hearing and it is not so arbitrary as to find that he erred as a matter of law.

The Hearing Officer may have lacked a sufficient factual basis for his interim determination of A.C.'s educational placement. However, any such deficiency on his part is insufficient to vacate his order. Nonetheless, this does not preclude a finding that Abington Heights is likely to be successful on the merits in the Hearing Officer's final decision. The Hearing Officer's Pendency Memorandum clearly recognizes that a move from Waverly Elementary to Clarks Summit Elementary "may be possible in the long run" and notes that his "only determination at this point is where the Student must go to school while [the due process] hearing is pending, and what services the Student must receive during this time." (Pendency Memorandum, at 4). Consequently, the Hearing Officer is not discounting the possibility that moving A.C. may be appropriate in the future and, more importantly, by stating that this move may be possible if A.C.'s IEP team can create and implement an appropriate transition plan, he provides Abington Heights with the standard it must meet with respect to any attempt on its part to move A.C. to Clarks Summit Elementary.

Key to the possibility of success for the plaintiff is the Hearing Officer's determination that "stricter proof will be required in the broader context of the dispute" and that "questions about where the Student may or may not be placed, and what services the Student may or may not require, will surely be answered as this hearing goes forward." (Pendency Memorandum, at 4). In light of the testimony offered by the defendants' witnesses during this Court's hearing, some of which relied on non-existent or incorrect facts, and Plaintiff's effective rebuttal witnesses, it appears unlikely that the defendants can meet their burden and therefore Abington Heights has a reasonable chance of success on the merits.

Defendants offered three witnesses in support of their argument that A.C.'s difficulties with transitions would negatively affect A.C.'s educational functioning and ability to access his school program if he were transferred to, and educated at, Clarks Summit Elementary instead of Waverly Elementary. Dr. Naghma Aijaz, A.C.'s Pediatric Endocrinologist, testified that suddenly transitioning A.C. to a new environment would increase his stress as well as negatively affect his health. (Test. of Naghma Aijaz, Official Tr., April 1, 2014, Doc. 29, at 70). She also testified that she told A.C.'s mother not to consider a move to Clarks Summit Elementary "at this point." (*Id.* at 70, 71, 75). This testimony is not entirely convincing. The reality is that A.C. will face stressors on a daily basis, in any environment, many of which may well be unavoidable. Additionally, by stating that a move was not appropriate "at this point", Dr. Aijaz is not precluding the possibility that it would be acceptable for Abington Heights to move A.C. at a later date. Furthermore, Dr.

Aijaz's testimony that "it is very difficult for [A.C] to manage [the diabetes] on his own" indicates that regardless of A.C.'s school placement, he will require the same level of care. (*Id.* at 67). Despite her contention that his inability to manage the diabetes himself or self-monitor would be exacerbated by a possibility that he may not tell someone at a new school that he is not feeling well or needs help, this statement is seemingly made without taking into account the fact that A.C.'s one-on-one aide would remain the same at Clarks Summit Elementary, as would some of the teachers, administrators, and nurses.

Dr. Kara Schmidt, a licensed Neuropsychologist and Certified School Psychologist, testified as to her interactions with A.C. in completing a Neuropsychological and Psychoeducational evaluation of A.C. in the fall of 2013 for the school district. (Test. of Kara Schmidt, Doc. 29, at 92). Dr. Schmidt stated that moving A.C. from Waverly Elementary to Clarks Summit Elementary would be inappropriate and "impede his ability to access his educational programs and . . . to make progress within school." (*Id.* at 104). Further, Dr. Schmidt testified that the move would be inappropriate even if a transition plan was implemented to help A.C. move to Clarks Summit Elementary. (*Id.* at 106). However, as brought out by Plaintiff's counsel on cross-examination, much of Dr. Schmidt's opinions were based on incorrect facts. Dr. Schmidt stated that it was important for A.C. to attend the same school as his sibling. (*Id.* at 106). However, A.C.'s sibling moved to a different school this school year and no longer attends Waverly Elementary. (*Id.* at 106-107). Dr. Schmidt's evaluation of A.C. also took place prior to her having any knowledge of the school

district's proposal to move him to Clarks Summit Elementary. As such, Dr. Schmidt admitted that in making her evaluation as to whether the move was appropriate, she was unaware of (1) whether there would be a change in A.C.'s instruction in reading, math, or writing; (2) whether his personal aides would remain the same; (3) whether A.C.'s therapist would remain the same; and (4) whether A.C.'s daily schedule would change. (*Id.* at 116-117). Finally, in her report, Dr. Schmidt recommended that A.C. receive extended school year ("ESY") services. However, she was unaware that the ESY services take place at Clarks Summit Elementary and therefore A.C. would have to attend that school in order to receive this extended education program during the summer. (*Id.* at 117).

With respect to the numerous factors of which Dr. Schmidt was unaware, Plaintiff's witness, Dr. Thomas Quinn, Assistant Superintendent for Abington Heights School District, provided the Court with significant guidance, and further decreased the weight of Dr. Schmidt's testimony. According to Dr. Quinn, all four elementary schools in the Abington Heights School District, including Waverly and Clarks Summit, have the same general education curriculum, including language arts, science, social studies, and the subject matter in these regular education classes is the same, although the classroom teacher is different. (Test. of Thomas Quinn, Doc. 29, at 167-168, 178). The special education curriculum would also remain the same. (*Id.* at 168). The teachers for the special courses, such as music, art, physical education, computer applications, would be the same at both schools. (*Id.* at 170). Additionally, the building principal is the same at both schools, as is

the guidance counselor, the school psychologist, the occupational therapist and speech and language therapist, and the core individuals providing nursing services. (*Id.* at 170, 171, 172). Further, A.C.'s one-on-one aide would also remain the same. (*Id.* at 171-172). The most significant changes appear to be the fact that A.C. would have entirely different peers, the school van would be different, the classrooms would be slightly larger, and the building layout would be different. (*Id.* at 169, 172, 178).

Given the testimony before the Court, A.C.'s transition issues alone may not be sufficient to compel a final determination that he must remain at Waverly Elementary. It is clear that no matter where A.C. attends school, he will face transition issues. For example, regardless of which school A.C. ultimately attends, his classroom teacher will not be the same next year, simply by virtue of moving up a grade. (Test. of Thomas Quinn, Doc. 29, at 184). His classrooms may also change. Despite A.C.'s mother's understandably emotional testimony, she provided no compelling evidence that A.C. would face such insurmountable transitional issues as to preclude him from attending Clarks Summit Elementary. The documentation provided to the Hearing Officer and this Court and the testimony offered by Defendants' witnesses do not appear sufficient to meet the Hearing Officer's admonition that "stricter proof will be required in the broader context of the dispute" in order to keep A.C. at Waverly Elementary. Therefore, Abington Heights, on the record evidence, has shown a reasonable likelihood of success on the merits of the ultimate resolution of the dispute as to A.C.'s proper educational placement.

### 2. *Irreparable Harm to Abington Heights School District*

At the outset, we have serious concerns that a school district could only rarely show

that it would suffer irreparable harm if a stay-put order were not enjoined.  We do recognize

that a school district could potentially successfully assert that a failure to obtain injunctive

relief could irreparably harm all, or part of, its educational program, or all, or part of, a

specific educational program, such as the program directed toward implementation of its

responsibilities under the IDEA.  Yet, this case does not present such a scenario and

Plaintiff's evidence does not support any claim that it will be irreparably harmed if the Court

denies the present motion.

While the precise nature of the harm that a school district must face in the IDEA

context for such harm to be deemed irreparable has not been delineated by this Circuit or

any other, we need not reach this issue as Plaintiff has clearly failed to present a claim of

harm that in any other context could be deemed irreparable. [5]  Abington Heights essentially

provides staffing and related financial reasons why it is harmed by the Hearing Officer's

order if no injunction issues.  The school district has been forced to re-staff, or move, nurses

from the other elementary schools within the district in order to accommodate A.C.'s needs

and the Hearing Officer's order.  The school district alleges that, by virtue of the stay-put

order mandating that a full-time nurse be present at Waverly Elementary, they are

---

[5] Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot
atone for it." *Opticians Ass'n of America v. Indep. Opticians of America*, 920 F.2d 187, 195 (3d Cir. 1990)
(citing *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)).  Here, A.C.'s parents originally offered to pay for
a private nurse, thereby hurting any argument by the school district that it cannot bear the financial burden
of providing a nurse.

"extremely uncomfortable with the arrangements that exist in some of [the] other buildings so that [Abington Heights] can provide full-time coverage at Waverly as well as at [Clarks Summit]." (Test. of Thomas Quinn, Doc. 29, at 175). Further, Abington Heights claims that within the last two years, it "established a schedule to provide full-time nursing coverage at Clarks Summit, with the understanding that anyone in the future who required that service would properly attend there." (*Id.* at 167). As Plaintiff correctly argues, it is not unreasonable to allow a school district to "take into account the impact a proposed placement would have on limited educational and financial resources."[6] *Cheltenham School Dist.v. Joel P. by Suzanne P.*, 946 F.Supp. 346, 352 (E.D. Pa. 1996) *aff'd*, 135 F.3d 763 (3d Cir. 1997) (citing *Barnett by Barnett v. Fairfax Cnty School Bd.*, 927 F.2d 146 (4th Cir. 1991)). However, these considerations do not prevail over the Hearing Officer's decision under §1415(j) in this case. The Third Circuit's strong emphasis on the policy considerations of the stay-put provision suggests that once the stay-put order has been issued, the school has a financial responsibility to maintain the status quo in the child's pendent placement. Consequently, the District's financial and staffing concerns fail to establish any significant burden on the district, let alone any irreparable harm. Nonetheless,

---

[6] In support of this argument, Plaintiff contends that a school district's provision of school nursing services "requires countless decisions about how to allocate valuable school resources" including "consider[ing] the requirements of the Commonwealth's School Code (24 Pa. Stat. § 14-1401 et seq.), the requirements of the state board of nursing (49 Pa. Code § 21.1 et seq.), state labor law including the collective bargaining agreements between the nurses and the District (43 Pa. Stat. § 1101.101), and, of course, shrinking school budgets during an era of government belt-tightening." (Doc. 4, at 14). While this statement correctly delineates important concerns that the school district must consider, Plaintiff has not demonstrated the extent to which the Hearing Officer's order, broadly providing the school district with the "sole discretion as to how a full-time nurse will be provided" (Pendency Order, at 1), causes it irreparable harm with respect to these considerations.

we do not discount the value of these statements and issues and admit that they may ultimately enable Abington Heights to obtain a favorable final decision from the Hearing Officer. They are not, however, sufficient to meet the burden of showing "irreparable harm."

### 3. Balancing of Harms to Abington Heights and A.C.

For the Court to grant Abington Heights' motion, the school district must establish not only that it would suffer irreparable harm if the Court does not enjoin the stay-put order but also that the "balance of harms" favors the issuance of injunctive relief, i.e., that the injury to the school district if an injunction does not issue is greater than the injury to A.C. if the injunction is issued and the stay-put order is enjoined. *See Winter*, 555 U.S. at 24 ("In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief'." (Quoting *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987))); *see also Boys Markets v. Retail Clerks Union, Local 770*, 398 U.S. 235, 254, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) ("Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity – whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance."). A review of the record indicates that Plaintiff has failed to meet this burden.

Here, Defendants argue that moving A.C. to Clarks Summit Elementary constitutes a change in A.C.'s 'current educational placement', which would thereby contravene the IDEA, and that the move "will harm him both educationally and medically." (Def.'s Brief in Opp. to Pl.'s Motion for a Statutory Stay-Put Injunction, Doc. 20, at 8-10; Def.'s Supp. Brief in Opp. to Pl.'s Motion for a Statutory Stay-Put Injunction, Doc. 26, at 8). Specifically, Defendants offer Dr. Schmidt's testimony that a move would result in "significant educational regression", and Dr. Aijaz's testimony that the move would cause A.C. "certain" increased stress which would complicate his diabetes and affect his health. (Doc. 26, at 1).

Defendants are undoubtedly correct that moving A.C. may cause him to suffer more anxiety and stress and will require him to become familiar with a new environment. However, this would likely be the case in connection with any change in learning environment. Dr. Schmidt recommended that A.C. participate in ESY services, which are held at Clarks Summit Elementary. A.C.'s mother admitted that A.C. had participated in this program twice before. (Test. of J.C., Doc. 29, at 136-137). Further, A.C. will not be able to remain at Waverly Elementary for the entirety of his pre-high school education and he will eventually be required, in the normal educational progression, to move to another school. Nonetheless, by enjoining the existing stay-put order, the Court risks causing A.C. to move

twice should the Hearing Officer ultimately decide that A.C. must remain at Waverly

Elementary.[7]

Even if A.C.'s difficulties in adapting to a new environment or the possibility that he

may ultimately change schools twice were alone insufficient to unequivocally show that A.C.

would suffer a greater harm than Abington Heights if the existing stay-put order is enjoined,

an additional and presently existing harm that must be considered is the current absence of

a transition plan.[8]  The issues of placement and transition cannot be "so radically separated"

and "transition periods and timing of placement are integral elements of any educational

program." *Drinker*, 78 F.3d at 866.  According to Dr. Schmidt, it would take three to six

months for A.C. to successfully transition to a new school, and if such a move were to take

place, a transition plan should be in place.  (Test. of Kara Schmidt, Doc. 29, at 106, 128-

129).  Further, she does not believe that, at this point, a successful and appropriate

transition plan could even be drafted in the absence of more data.  (*Id.* at 107).  Abington

Heights does not dispute the necessity of a transition plan, but argues that the legal

standard in this case does not take into account "an analysis of how long it will take this

student to transition."  (Official Tr., April 1, 2014, Doc. 29, at 209).  Plaintiff may be correct

---

[7] In balancing the hardships that a student might face, the Court in *M.K. v. Roselle Park Board of Education*, considered as a factor that "even assuming this Court affirms the ALJ's determination that [Plaintiff] should be subject to interim placement at the in-district program, he might still have to be moved twice if the ALJ ultimately determines that the IDEA mandates a different placement." *Roselle Park Bd. of Educ.*, 2006 WL 3193915 at *13.

[8] The Court notes that Defendants have admitted that Abington Heights has now presented A.C.'s family with a transition plan that was the subject of testimony at an April 11, 2014, administrative hearing. (Doc. 26, at 14). However, this plan is allegedly "contested hotly" and this Court has no way of knowing whether, or when, such a transition plan will be adopted.

that a transition plan, or lack thereof, is not determinative in the Hearing Officer's decision of the appropriate stay-put placement, particularly in light of Dr. Quinn's testimony that the school district does not develop transition plans prior to knowing whether the child will be moving. However, we cannot agree that the lack of a plan at this stage of the proceedings is not a factor that we should take into account in determining whether A.C. will suffer an irreparable harm. Dr. Quinn made clear that Clarks Summit Elementary has experience handling transitions and detailed certain steps that could be taken to help A.C., including a modified school day for a period of time and acquainting him with the school nurse and other staff with whom he is likely to interact with on a daily basis. (Test. of Thomas Quinn, Doc. 29, at 186). Nonetheless, the fact that the Hearing Officer specifically stated that A.C.'s IEP team should craft and implement an appropriate transition plan in order for a move to Clarks Summit Elementary to be possible, as well as defendants' statement that the current proposed transition plan is "contested hotly", indicates both that a transition plan is necessary and that there is a disagreement as to the appropriateness of the steps needed to successfully move A.C. In such a case, it is uncertain as to when a transition plan, essential for any move for A.C., can be finalized and the Court recognizes the likelihood that, if the stay-put order is lifted and A.C. is moved to Waverly Elementary in the absence of an agreed upon plan, A.C. may be significantly harmed.

If the Court enjoins the current stay-put order and A.C. is placed at Clarks Summit Elementary, A.C.'s transition issues and medical needs, in conjunction with the lack of a

transition plan to aid A.C.'s move to Clarks Summit Elementary, would create a significant

harm to A.C.  In turn, any harm to the school district presents only solvable issues of a

financial, staffing, and administrative nature.  Therefore, Plaintiff has failed to establish that

the granting of preliminary injunctive relief will not result in greater harm to A.C than the

harm the school district will sustain if the request for injunctive relief is denied.  The entirety

of the evidence offered to the Court shows that any resulting harm to A.C. if the Court

grants the injunction undoubtedly outweighs any harm to Abington Heights if the Court

denies such relief.

### 4. Public Interest

A district court's ability to review a stay-put order while due process proceedings are

ongoing is vital to protecting the public interest.  *See Murphy v. Arlington Cent. School Dist.*

*Bd. of Educ.*, 297 F.3d 195, 199-200 (2d Cir. 2002) (J. Sotomayor) ("[G]iven the time-

sensitive nature of the IDEA's stay-put provision, an immediate appeal is necessary to give

realistic protection to the claimed right.  Section 1415(j) establishes a student's right to a

stable learning environment during what may be a lengthy administrative and judicial

review. If the child is ejected from his or her current educational placement while the

administrative process sorts out where the proper interim placement should be, then the

deprivation is complete. . . . Hence, as a practical matter, access to immediate interim relief

is essential for the vindication of this particular IDEA right." (Internal citations omitted)).

However, while the ability for a district court to review a stay-put order issued under the due process requirements of the IDEA is indispensable, courts must also attempt to avoid, and discourage, unnecessary piecemeal court proceedings from regularly occurring when either party is unhappy with a finding by a Hearing Officer prior to the due process hearing's ultimate resolution. The public is served by having the hearing move forward with as few delays as possible and by knowing the child's educational placement with certainty throughout the duration of the proceedings.

While "district courts have discretion to determine how much deference to accord the administrative proceedings," and "must consider the administrative findings of fact, [they are] free to accept or reject them." *Carlisle Area School v. Scott P. by and through Bess P.*, 62 F.3d 520, 527 (3d Cir. 1995) (citing *Oberti*, 995 F.2d at 1219). Nevertheless, from a public interest standpoint, in reviewing a Hearing Officer's decision, Courts should be cautious not to assume the Officer's duties or unnecessarily inject themselves into ongoing IDEA required due process hearings.

Furthermore, although Plaintiff is likely to succeed on the merits in a final disposition as to A.C.'s placement, to put too much weight on this element would contravene public policy. This policy consideration is particularly important in in light of the Third Circuit's analysis in *Drinker* that § 1415(j) "represents Congress' policy choice that all handicapped children, *regardless of whether their case is meritorious or not,* are to remain in their current

educational placement until the dispute with regard to their placement is ultimately resolved." *Drinker*, 78 F.3d at 864 (emphasis added).

### 5. Conclusion

For the reasons discussed, Abington Heights has failed to establish all of the necessary elements for the issuance of a preliminary injunction in its favor. Specifically, while the Court believes that the school district is likely to succeed on the merits, there is no indication that by denying Plaintiff's request, the school district will suffer irreparable, or even substantial, harm, while there is evidence that granting the injunction will result in far greater harm to A.C. than to Abington Heights. Furthermore, granting the injunction would not further the public interest, but may in fact be contrary to it.

### V. CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's Motion for a Statutory Stay-Put Injunction (Doc. 3). A separate Order follows.

Robert D. Mariani
United States District Judge